UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| HERB REED ENTERPRISES, LLC, a Massachusetts Company, | Case No. 2:12-cv-00560-MMD-GWF |
| Plaintiff, | ORDER |
| v. | (Plf's Motion for Preliminary Injunction –dkt. no. 2) |
| FLORIDA ENTERTAINMENT MANAGEMENT, INC., a Nevada Company, and LARRY MARSHAK an individual, | (Defs' Objection to Plaintiff's Supplement to Its Motion for a Preliminary Injunction –dkt. no. 35) |
| Defendants. | |

## I.    INTRODUCTION

The Platters "were one of the top vocal groups of the Fifties, delivering smooth, stylized renditions of pop standards."[1]  "During the latter half of the Fifties, the Platters were a global sensation, touring the world as international ambassadors of musical goodwill."[2]  Yet along with great fame often comes great hardship, and The Platters were no exception.  For as long as The Platters have been famous, the right to the ownership and use of the band's legendary name has been litigated among band members, their manager and various parties.  The last surviving member of The Platters passed away

---

[1] *The Platters Biography*, Rock and Roll Hall of Fame, http://rockhall.com/inductees/ the-platters/bio/

[2] *Id.* (citations omitted).

shortly after this lawsuit was filed, but the fight continues.   In this case, the assignee of founding band member Herb Reed ask the Court to tell Defendants – who promote an unlicensed show featuring a group called The Platters – that "It Isn't Right."[3]   Plaintiff asks that the Court answer Reed's "Prayer,"[4] and hold that Defendants are a merely "Great Pretender"[5] while "Only You [Reed]" ("and [Reed] Alone")[6] owns "The Platters" mark.

Before the Court are Plaintiff Herb Reed Enterprises, LLC's ("HRE") Motion for Preliminary Injunction (dkt. no. 2) and Defendants' Objection to Plaintiff's Supplement to Its Motion for a Preliminary Injunction (dkt. no. 35). The Court has also considered the relevant Oppositions and Replies to these Motions, as well as arguments presented by counsel at the hearing held on July 13, 2012.

## II.    BACKGROUND

### A.    Parties

Larry Marshak and his company Florida Entertainment Management, Inc. ("EnMan") organize and promote live musical performances. (Dkt. no. 17 at ¶ 14.)  One of his groups is called The Platters.  In addition to The Platters, EnMan promotes groups performing as The Marvelettes and Cornell Gunter Coasters.  (*Id.*)  Since 2001, Marshak and his company have promoted and produced a show at the Rio Hotel in Las Vegas, Nevada using "The Platters" mark.   (*Id.* at ¶ 16-17.)  EnMan also books groups performing under "The Platters" mark in performances across the nation.  (*Id.* at ¶ 23.)

Herbert "Herb" Reed founded the vocal performing group The Platters in 1953.  At the time it achieved national recognition and success, the five members of the band (though not the five founding members of the group) were Reed, Paul Robi, David

---

[3] The Platters, "It Isn't Right" (1956).

[4] The Platters, "My Prayer" (1956).

[5] The Platters, "The Great Pretender."  (1955).

[6] The Platters, "Only You (and You Alone)."  (1955).

2

1    Lynch, Zola Taylor, and Tony Williams.  These are the five members recognized in other
2    related decisions as the "original members" of The Platters, and this Order also refers to
3    them as the "original members" of the group.  *See, e.g., Marshak v. Reed*, No. 96 CV
4    2292, 2001 WL 92225, at *3, fn. 2 (E.D.N.Y. Feb. 1, 2001) *aff'd*, 13 F. App'x 19 (2d Cir.
5    2001)*and vacated in part*, 34 F. App'x 8 (2d Cir. 2002) ("*Marshak I*").  The Platters
6    enjoyed great success during the 1950s and 1960s, with hit singles including, "Only
7    You," "The Great Pretender," and "Smoke Gets in Your Eyes."  *Id.* at *3.  The Platters
8    were inducted into the Rock and Roll Hall of Fame in 1990 and received similar
9    accolades throughout the 1990's and early 2000's.  (Dkt. no. 3-9 at ¶ 8.)  Their music
10   remains popular today.  The group continues to sell video recordings of old Platters'
11   performances.  (Dkt. no. 3-9 at ¶22.) The Platters' songs continue to be sold, played on
12   the radio, and used in national television commercials.  (*Id.* at ¶ 23.)  Platters hits are
13   also featured on over 80 movie sound-tracks, including *The Curious Case of Benjamin*
14   *Button* and *Ocean's Twelve*.  (*Id.*)

15          The Platters broke up in the 1960s, and since then, as another court noted, the
16   former band members have "spent more time in judicial venues than in musical ones."
17   *Marshak I*, 2001 WL 92225, at *1.  That was in 2001.  This conclusion continues to ring
18   true today as the litigation among those claiming ownership of "The Platters" trademark
19   has persisted throughout the past decade.

20          Much of the litigation regarding ownership of "The Platters" trademark stems from
21   a 1956 agreement between the original members of the group and their manager Buck
22   Ram's company, Five Platters, Inc. ("FPI").  Ram began managing The Platters in 1954.
23   In 1956, all original members of the group executed employment contracts with FPI.  "As
24   part of those contracts, each of the performers assigned to FPI their rights in the name
25   'The Platters,' in exchange for the issuance of shares of stock in FPI."  *Marshak I*, 2001
26   WL 92225 at *3.

27   ///

28   ///

3

1   Between 1962 and 1969, all of the original members of the band left The Platters,

2   beginning with Tony Williams in 1962 and ending with Herb Reed in 1969.  *Marshak I*,

3   2001 WL 92225, at *4.  However, "each of the original members, after leaving the group,

4   also continued to perform under some derivation of the name 'The Platters,'" and "[t]he

5   legal battles began." *Id.*  Since the late 1960s, the questions of who can perform under

6   the name "The Platters" and who owns "The Platters" trademark have been litigated

7   multiple times in every decade, and resulted in what a 1987 New York court described

8   as "a tangled web of litigation resulting in a number of inconsistent federal and state

9   court decisions." *FPI v. Williams*, 4 U.S.P.Q.2d 1296, 1297 (N.Y. Sup. 1987).  District

10  Judge Nina Gershon of the Eastern District of New York provided an exhaustive history

11  of the litigation involving the former band members and FPI between 1967 and 2000 in a

12  2001 case involving Marshak and Reed.  *See Marshak I*, 2001 WL 92225.   This Order

13  summarizes only some of that litigation and the litigation since then, highlighting the

14  cases most relevant to the present action.

15      **B.      Litigation History Surrounding "The Platters" Trademark**

16      In 1972, FPI sued Paul Robi and Zola Taylor "for trademark infringement in the

17  California Superior Court, Case No. C43926, claiming exclusive rights to 'The Platters'

18  mark based on the 1956 assignments." *Herb Reed Enterprises, Inc. v. Monroe Powell's*

19  *Platters, LLC*, __F. Supp. 2d at ___, No. 2:11-CV-02010, 2012 WL 288705, at *1 (D.

20  Nev. Feb. 1, 2012).  "In 1974, the court granted judgment in favor of Robi." *Id.* (citing

21  *Robi v. Five Platters, Inc.*, 838 F.2d 318, 320, 324 (9th Cir.1988)).  The court held that

22  FPI "'was a sham used by Mr. Ram to obtain ownership in the name 'Platters,'" and FPI's

23  issuance of stock to the group members was "'illegal and void' because it violated

24  California corporate securities law." *Id.* at *1 (quoting the 1974 California decision).

25      **1.      Litigation between FPI and Robi**

26      In 1985, Robi sued FPI seeking a declaratory judgment regarding the parties'

27  rights to "The Platters" trademark and a permanent injunction against FPI interfering with

28  Robi's right to perform under "The Platters" name.  *Marshak I*, 2010 WL 92225, at *8.

FPI counterclaimed against Robi for trademark infringement. *Id.* "The district court dismissed FPI's complaint against Robi based on the claim preclusive effect of the 1974 California judgment." *Monroe Powell's Platters*, 2012 WL 288705, at *2. The Ninth Circuit affirmed in 1988. *Id.* It held that "[t]he claim preclusive effect of the 1974 California judgment precludes [FPI] from challenging Robi's use of the name THE PLATTERS." *Id.* (citing *Robi v. Five Platters, Inc.*, 838 F.2d at 324). On remand, the court "cancelled FPI's registration of the mark and permanently enjoined FPI from challenging Robi's use of the mark." *Id.* (citing *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1441 (9th Cir.1990)). On appeal again, the Ninth Circuit affirmed. *Id.*

### 2.    1984-87 Litigation between FPI and Reed

In 1984, FPI sued Reed for trademark infringement in the United States District Court for the Southern District of Florida. *The Five Platters, Inc. v. Herbert Reed, et al.*, No. 84-8324-CIV-SMA. The parties settled in 1987, and as part of the settlement Reed assigned FPI all rights he had in FPI stock and agreed not to perform under the name "The Platters." *Marshak I*, 2001 WL 92225, at *10. However, the stipulation included the following provision:

> In the event that a court of competent jurisdiction enters a final order with all appeals being exhausted that the Five Platters, Inc. has no right in the name "The Platters," then nothing contained herein shall be construed to limit Herbert Reed's rights in the name "The Platters" and this agreement shall not inure to any party other than The Five Platters, Inc., and its successors and assigns or Herbert Reed.

(Dkt. no. 16-1 at 4.) This Order refers to this provision as the "escape clause."

### 3.    2001 Litigation between FPI and Reed

In 2001, FPI and Tony Williams' heirs sued Reed for trademark infringement, this time in a New York district court (the "New York action"). *Marshak I*, 2001 WL 92225, at *1. At the time, Larry Marshak managed The Tony Williams Platters, the performing group owned by Williams' heirs, and Marshak was also a plaintiff in the New York action. *Id.* FPI and Marshak sought a "determination of their rights to the name 'The Platters,' and an injunction prohibiting [Reed] from using that name or interfering with [FPI or

Marshak's] use of it." *Id.* Reed counterclaimed alleging trademark infringement on the part of the defendants. *Id.* There,

> [t]he district court interpreted the 1987 stipulation–specifically Reed's consent to dismissal with prejudice and the escape clause–as barring Reed from asserting that he has any right to the name 'The Platters' as against FPI or those claiming through FPI except as specifically allowed in the agreement, or from otherwise interfering with [FPI's] rights to the use of 'The Platters.' The district court reasoned that a stipulation of dismissal with prejudice dismisse[d] claims, counterclaims, and claims that could have been brought by the parties. Therefore, the 1987 stipulation dismissed FPI's claims against Reed, Reed's counterclaims against FPI, and Reed's claim to exclusive rights to the mark because Reed could have brought such claim in the Florida action.

> The district court further concluded that there [had] been no adjudication that FPI has no right to the name 'The Platters' as required by the escape clause of the stipulation for settlement. Accordingly, the district court granted FPI's motion for summary judgment and declared FPI's rights, and the rights of the other plaintiffs derived from FPI[,] as superior to Reed's rights. The district court also issued an injunction barring Reed from interfering with FPI's use of the mark and from performing or using "The Platters" mark. [Reed was not enjoined from using the mark in connection with the band names "Herb Reed and the Platters" or "Herb Reed's Platters"].

> Reed appealed to the Second Circuit. Meanwhile the Ninth Circuit in *Five Platters, Inc. v. Powell* held that FPI used "The Platters" with intent to mislead the public and remanded to determine if any of FPI's use was not false or misleading. The Second Circuit remanded *Marshak v. Reed* and directed the district court to consider the impact of the Ninth Circuit decision on the district court's grant of FPI's motion for summary judgment and FPI's motion to cancel Reed's registration of the mark. The district court adhered to its earlier decisions because the Ninth Circuit's holding did not determine that FPI has no right in the name "The Platters," and thus, the holding did not trigger the escape clause. Reed again appealed and the Second Circuit affirmed the district court.

*Monroe Powell's Platters,* 2012 WL 288705, at *3 (citations and quotation marks omitted; brackets added).

Notably, although in 2001 the New York court held that FPI had a superior right to Reed in "The Platters" trademark, the Ninth Circuit decision, *FPI v. Powell*, contradicted that holding. *Five Platters, Inc. v. Monroe Powell*, 7 F. App'x 794, 795 (9th Cir. 2001). That decision held that:

> [a]ny use identifying [FPI] as "The Platters," "The Five Platters," "The Buck Ram Platters," or "The Original Platters" is false and misleading under those prior decisions. Thus, *unless the [FPI] can present evidence that*

*they used the trademark in a way that was not false and misleading* (*e.g.,* by identifying the group as "The Platters Since 1970" or some similarly distinguishing label), *they cannot assert a common law trademark in "The Platters*." We reverse the district court's grant of summary judgment on the trademark claim and remand for an evidentiary hearing as to whether any of the plaintiffs' use of the mark was not false and misleading. If the plaintiffs cannot present evidence of non-misleading use as defined by this order and the earlier decisions, the defendants are entitled to summary judgment on the plaintiffs' common law trademark claim. At that time, the district court will no longer possess federal question subject matter jurisdiction. . . .

*FPI v. Monroe Powell*, 7 F. App'x at 795-96 (emphasis added).[7]  "On remand the district court dismissed for lack of federal jurisdiction, Case No. 98–3712 R (BQRX)." *Monroe Powell's Platters*, 2012 WL 288705, at *2.  According to a footnote in a 2002 Eastern District of New York decision discussing the Ninth Circuit decision, on remand the parties agreed that "the action was dismissed because FPI in the pretrial order abandoned the trademark claim, leaving only state law claims." *Marshak v. Reed*, 229 F. Supp. 2d 179, 182 fn. 2 (E.D.N.Y. 2002) ("*Marshak II*").  Despite this, the 2002 New York court held that the Ninth Circuit decision did not trigger the 1987 escape clause because the decision could be read as "leaving open the possibility, however remote, that FPI can establish a common law trademark right to the name 'The Platters.'" *Id.* at 185.

Therefore, the result of the 2000-2002 litigation between Reed, FPI, and Marshak was (1) that FPI did not own "The Platters" trademark; (2) but it had not been conclusively established by an appellate court that FPI could not some day establish common law ownership over "The Platters" mark; (3) because of this, the "escape clause" in Reed's 1987 stipulation had not been triggered; and (4) Reed was enjoined from performing under the mark.  However, Reed was not enjoined from performing under certain names including "Herb Reed and the Platters" or "Herb Reed's Platters." *See Marshak v. Reed*, No. 96-CV-2292, 11-CV-2582, 2012 U.S. Dist. LEXIS 32951, at *2 (E.D.N.Y. March 12, 2012) ("*Marshak III*").

---

[7] As a point of clarification, *FPI v. Monroe Powell* concerned FPI's common law rights in "The Platters" mark; the 1988 *Robi v. Reed* decision held that FPI had no contractual ownership over the mark due to prior decisions holding that the 1956 contract was a sham. *See Robi v. Five Platters, Inc.*, 838 F.2d at 324.

#### 4.    2011-2012 Litigation Involving Reed

In 2010, Reed sued FPI, Personality Productions, Inc. ("PPI"), and Jean Bennett for trademark infringement.  *HRE v. Bennett*, No. 2:10-CV-01981, 2011 WL 220221, at *3 (the "2011Nevada action").[8]  On April 22, 2011, Reed filed a Motion for Default Judgment against FPI and PPI.  The Court subsequently entered a default judgment and a permanent injunction against the defendants declaring: (1) FPI and PPI "never used the mark 'The Platters' in a manner that [was] not false and misleading and thus never acquired common law rights to the mark"; and (2) "Reed, having first used the mark 'The Platters' in commerce in 1953, and having continuously used the mark in commerce since then has superior rights to the mark to all others," including FPI, PPI, and "anyone claiming rights from or through them."[9]  *Monroe Powell's Platters*, 2012 WL 288705, at *4.

In February 2012, Reed sought a preliminary injunction in Nevada district court against Monroe Powell and Monroe Powell's Platters, Inc. ("MPI"), a corporation using "The Platters" mark to promote a singing group called The Platters (though sometimes called Monroe Powell's Platters) ("the 2012 Nevada action").  *Monroe Powell's Platters*, 2012 WL 288705, at *1.  FPI originally hired Powell to perform with "The Platters" in 1970, after Reed had discontinued his relationship with the corporation.  *Id.* at *1.  The

---

[8] "Although Bennett filed an Answer on behalf of herself, FPI, and PPI, the Court ordered Bennett to find counsel for FPI and PPI. The  [c]ourt also ordered FPI and PPI to file answers or responses to the Complaint by March 31, 2011.  On March 30, 2011, Bennett informed the Court that no one would be representing FPI and PPI."  *Monroe Powell's Platters*, 2012 WL 288705, at *3.

[9] EnMan argues that the default judgment should not be considered binding upon this Court.  It asserts that FPI and PPI no longer claimed ownership in "The Platters" mark in 2011, and that because whatever rights those corporations had in the mark had been signed over to Marshak and his company, Defendants should have been joined in that action.  As such, Defendants claim that enforcing the judgment against EnMan and Marshak would deprive them due process.  (Dkt. no. 16 at 18.)  During oral argument, Defendants argued that Plaintiff knew FPI was not a valid entity and should  have joined Marshak.  Plaintiff argued that Marshak knew about the lawsuit but failed to intervene.  Whether the parties had compelling reasons for their action or inaction with respect to the 2011 Nevada lawsuit is of no import.  The Court construes the 2011 Nevada decision as a final judgment on the merits on only the issues litigated therein – namely, Reed's rights to "The Platters" mark vis-à-vis FPI.

8

1  Court in the 2012 Nevada action held that the 2011 Nevada action triggered the 1987

2  escape clause:

> [a]ccording to this Court's default judgment in the [2011] Nevada action, FPI never acquired common law rights to 'The Platters' mark and Reed has superior rights to the mark to all others. Thus this Court determined that FPI has no right in the name 'The Platters' as required by the 1987 stipulation. This Court was a court of competent jurisdiction because it exercised jurisdiction pursuant to 28 U.S.C. § 1331. The default judgment was entered on May 16, 2011, and FPI and PPI failed to appeal the judgment within thirty days as required by Federal Rule of Appellate Procedure 4(a)(1)(A). As such, the default judgment qualifies as a final order with all appeals being exhausted and triggered the escape clause.

9  *Id.* at *5 (brackets added; quotation marks omitted).  The court granted Reed's motion

10  and enjoined Powell from further use of the mark.  *Id.* at *8.

11      In between the two Nevada actions, Marshak sued Reed for civil contempt in the

12  Eastern District of New York, alleging that Reed's 2011 Nevada lawsuit violated the 2001

13  injunction issued by that court.  *Marshak III*, 2012 U.S. Dist. LEXIS 32951, at *2.  In a

14  separate but related action, Marshak also sought damages resulting from Reed's alleged

15  contempt.  *Id.* at *3. The court held that Reed "did not use 'The Platters' mark in violation

16  of the 2001 Injunction and did not make any misrepresentations to the Nevada District

17  Court as to the nature of his rights in 'The Platters' mark."  *Id.* at *15.  The court denied

18  Marshak's motion and granted Reed's motion for summary judgment concerning

19  Marshak's damages claim.  *Id.* at *15-16.

20      In April 2012, Reed's company HRE filed suit in this Court against Marshak and

21  EnMan for trademark infringement, unfair competition, false designations of origin and

22  false representations, and trademark dilution. (Dkt. no. 1.)[10]  Defendants counterclaimed,

23  alleging unfair competition on HRE's part.  HRE filed this Motion on April 4.  It asks that

24  the Court enjoin Marshak and EnMan from using "The Platters" mark in connection with

25  a vocal group in any advertisements, promotional marketing, or other materials without

26

27  _____

28  [10] Before his June 4, 2012, death, Reed assigned all rights in the mark "The Platters" to HRE.  (Dkt. no. 19 at ¶ 19).

9

1   Plaintiffs' written permission, except when performing as "Larry Marshak's tribute to The

2   Platters" or "Larry Marshak's salute to The Platters."  (Dkt. no. 2.)

3

4   **III.   DEFENDANT'S OBJECTION TO PLAINTIFF'S SUPPLEMENTING ITS REPLY
        BRIEF**

5       On June 1, 2012, Plaintiff filed supplemental evidence in support of its Reply

6   Brief.  The filing contains exhibits of newly-discovered evidence Plaintiff believes is

7   relevant to its Motion. (Dkt. no. 28.)  Plaintiff did not seek leave from this Court before

8   filing its supplemental evidence.  Defendant objected to the filing, claiming that the filing

9   is procedurally improper and contains inadmissible hearsay. (Dkt. no. 35 at 2-3.)  In its

10  Objection, Defendants also request that the Court allow supplemental briefing on

11  Plaintiff's Motion for Preliminary Injunction to present argument regarding the impact of

12  Herb Reed's death on Plaintiff's pending Motion. (*Id.* at 8.)  Reed died on June 4, 2012,

13  after this Motion had been briefed by both parties. (*Id.*)

14      The Court has reviewed the evidence in Plaintiff's supplemental filing and finds it

15  largely tangential to Plaintiff's Motion.  The Court does not consider the evidence in this

16  Order.  Further, the Court takes judicial notice of the fact that Herb Reed passed away

17  on June 4, 2012.  The parties argued their respective positions about the impact of

18  Reed's death on this Motion at oral argument.  Supplemental briefing is unnecessary.

19  Reed's death was considered by the Court in reaching its conclusions and the Order

20  discusses Reed's death where relevant.[11]

21  **IV.   CLAIM PRECLUSION AND LACHES**

22      **A.   Preclusive Effect of the New York Action**

23      "Res judicata bars all grounds for recovery which could have been asserted,

24  whether they were or not, in a prior suit between the same parties in the same cause of

25  action."  *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1319 (9th Cir. 1992).  Further,

26  
    _____

27  [11] Further, Defendants' conclusory assertion that because the "estate of Herb Reed and
    its assigns have no greater claim to THE PLATTERS mark than the estates of the other
    original Platters members . . . the Court should deny [Plaintiff's] motion for preliminary

28  relief" in light of Reed's death is unavailing for reasons discussed herein.

1  under "the Full Faith and Credit Act, federal courts must give state judicial proceedings

2  'the same full faith and credit ... as they have by law or usage in the courts of [the] State

3  ... from which they are taken.'" *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir.

4  1988) (quoting 28 U.S.C. § 1738) (other citations omitted)).   The "Act requires federal

5  courts to apply the res judicata rules of a particular state to judgments issued by courts

6  of that state." *Id.*

7          EnMan argues that the 1987 stipulation and the New York action preclude Reed

8  from arguing he owns "The Platters" mark.  (Dkt. no. 16 at 19.)  However, the court in the

9  New York action held that the 1987 stipulation "bar[red] Reed from assert[ing] that he

10  has any right to the name 'The Platters' as against FPI or those claiming through FPI

11  *except as specifically allowed in that agreement* . . ..".  *Marshak I*, 2001 WL 92225, at

12  *15 (emphasis and brackets added).   Reed now challenges EnMan's right to "The

13  Platters" trademark as allowed under the escape clause, because as the *Monroe*

14  *Powell's Platters* court held, after the 2011 Nevada action, Reed is "no longer limit[ed]"

15  from "assert[ing] rights in the name 'The Platters.'"   2012 WL 288705, at *5. To the

16  extent the 2011 and 2012 Nevada actions contradict any part of the prior litigation

17  involving the relevant parties to this Motion, the Court applies the last in time rule – that

18  is, when there are several conflicting judgments on the same claim or issue, the Court

19  gives "res judicata effect to the *last* previous judgment entered." *Robi v. Five Platters,*

20  *Inc.*, 838 F.2d at 328 (quoting *Americana Fabrics, Inc. v. L & L Textiles, Inc.*, 754 F.2d

21  1524,1530 (9th Cir. 1985) (emphasis in original)).

22          **B.      Preclusive Effect of the 2011 Nevada Action**

23          To the extent that HRE attempts to use the 2011 Nevada action as offensive

24  collateral estoppel on the issue of ownership, the Court declines to apply that doctrine

25  here.  Federal district courts are granted "broad discretion" in determining when to apply

26  offensive collateral estoppel.  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

27  However, the "general rule should be that in cases where a plaintiff could easily have

28  joined [the defendant] in the earlier action or where . . . the application of offensive

1    estoppel would be unfair to a defendant, a trial judge should not allow the use of

2    offensive collateral estoppel." *Id.*  HRE could have joined EnMan and Marshak in the

3    2011 Nevada action, but chose not to despite knowing that Marshak and EnMan have

4    used "The Platters" mark in connection with live musical performances since at least

5    2008.  (Dkt. no. 3 at 5.)

6         Moreover, "[a]llowing offensive collateral estoppel may . . . be unfair to a

7    defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent

8    with one or more previous judgments in favor of the defendant." *Id.* at 330.  In fact, the

9    Ninth Circuit previously chose not to apply the doctrine in a 1988 dispute involving FPI

10   and Tony Williams, in part because of this concern.  *Robi v. Five Platters, Inc.*, 838 F.2d

11   at 329-330.

12        **C.    Laches**

13        Defendants assert that the equitable doctrine of laches precludes HRE from

14   arguing that Defendants are liable for trademark infringement.  "Laches is an equitable

15   time limitation on a party's right to bring suit resting on the maxim that one who seeks

16   the help of a court of equity must not sleep on his rights."  *Jarrow Formulas, Inc. v.*

17   *Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002) (citations omitted).  The limitations

18   period for laches commences when the plaintiff knew or should have known about his

19   potential cause of action.  *Id.* at 838.

20        Defendants argue that Reed knew that Marshak has used "The Platters" mark

21   since 1996, or at latest 2001 when Marshak was a co-plaintiff in the 2001 New York

22   action against Reed.  However, as Defendants themselves acknowledge, the 1987

23   stipulation precluded Reed from asserting any rights in "The Platters" mark until a final

24   judgment with appeals exhausted determined that FPI had no ownership rights in "The

25   Platters" mark.  As stated, the final resolution of the 2001-2002 litigation in the Second

26   and Ninth Circuits provided Reed with strong language that FPI could not claim

27   ownership in "The Platters" mark.  But there was not yet a final ruling with all appeals

28   exhausted as required to trigger the 1987 escape clause.  *Marshak v. Reed*, 87 F. App'x

208, 209 (2d Cir. 2004), *affirming Marshak II*, 229 F. Supp. 2d at 185.  The escape clause was not triggered until the 2011 Nevada decision.  Thereafter, Marshak sued Reed in the Eastern District of New York for contempt.  *Marshak III*, 2012 U.S. Dist. LEXIS 32951, at *1.  Reed brought this action on April 4, 2012 – less than one month after the Eastern District of New York held that Reed had not violated that court's 2001 injunction against him.  Under any standard, twenty days does not constitute sleeping on one's rights.  Reed's trademark infringement claim is not barred by laches.[12]

In sum, the Court holds that (1) the 2011 Nevada action triggered the 1987 escape clause; (2) the 2001-2002 New York action does not preclude HRE from asserting ownership over "The Platters" mark; (3) the 2011 Nevada action does not collaterally estop Marshak from arguing that he is the senior user and owner of "The Platters"; and (4) Reed's claim is not barred by laches.

## V.    PRELIMINARY INJUNCTION

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest.  *Winter v. Nat.Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### A.    Likelihood of Success on the Merits

To establish a likelihood of success on the merits of a trademark infringement claim, the plaintiff must establish that he is "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark."  *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).

///

///

_____

[12] Defendants may be confused, because at times they appear to argue that Reed should have attempted to re-establish ownership rights in "The Platters" generally, rather than against Marshak and EnMan specifically, before 2011.  Whether or not Reed's waiting until 2010 to assert ownership in "The Platters" is a wholly separate matter, and has no bearing on the resolution of this case.

### 1.   Ownership

"It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 as *modified*, 97 F.3d 1460 (9th Cir. 1996).

### a.   Reed

Reed argues that he is the senior user because he was the founding member of The Platters and has used the mark in commerce through performances and/or receiving royalties since 1953.[13] (Dkt. no. 41 at ¶ 3.) A "successful music group does not abandon its mark unless there is proof that the owner ceased to commercially exploit the mark's secondary meaning in the music industry." *Marshak v. Schaffner*, No. 11 CIV 1104, 2012 U.S. Dist. LEXIS 66536, at *13 (S.D.N.Y., May 11, 2012) (citing *Marshak v. Treadwell*, 240 F.3d 184, 199 (3d Cir. 2001)).   Further, "[r]ights in a mark signifying a singing group are not abandoned by the owner upon the group's disbandment, so long as the owner continues to receive royalties from the sale of the group's previously recorded material." *Id.*   Therefore, although Reed and his assigns could not perform under "The Platters" mark from 1987 through January 2011, Reed continuously used the mark in commerce and never abandoned the mark. (*See* dkt. no. 41 at ¶ 3.) This holding is in accord with the *Monroe Powell's Platters* court, which determined that Reed had used "The Platters" mark continuously in commerce since 1953.   2012 WL 288705, at *5; *see also Robi v. Reed*, 173 F.3d 736, 740 (9th Cir. 1999) ("[W]hen Paul Robi left the

---

[13] Defendants argue that Plaintiff has not presented evidence credible to support HRE's contention that Reed continuously received royalties from 1953 to his death.  (Dkt. no. 42 at ¶ 31.)  However, in his declaration, Frederick Balboni, Reed's manager since 2005, stated that Reed and his estate have continuously received royalties from his Platters recordings. (Dkt. no. 41 at ¶ 3.) Defendants object that the Balboni declaration is insufficient and that HRE must provide "documentary evidence of a longstanding and continuous [sic] royalty stream" to establish Reed's continuous use of the mark in commerce.  Defendants are incorrect; the Balboni declaration suffices because "a preliminary injunction may be granted upon affidavits."  *Ross-Whitney Corp. v. Smith Kline & French Labs*, 207 F.2d 190, 198 (9th Cir. 1953).

1    group, he took no right to the service mark with him. . . "the mark remain[s] with the

2    original group. . . . Reed, who founded the group and is the only person who has

3    remained and performed with it from its inception, retains" the superior right "to use the

4    service mark . . .."); Gregory M. Krakau and John A. Mizhir Jr., *Trademark Rights of*

5    *Musical Groups*, Loy. L.A. L. Rev., May 2007, at 11, 12 (rights in a band name remain

6    with the original members who continuously exploit the mark).

7                                    **b.     Marshak**

8          Defendants claim that Marshak acquired superior ownership of "The Platters"

9    mark in three ways.  First, Marshak claims he acquired any rights belonging to original

10   Platters member Tony Williams' estate in 2003.  Second, Marshak claims his company

11   acquired all rights to "The Platters" belonging to FPI and PPI in 2009.  That is, in 2006,

12   LiveGold, Inc. acquired ownership of "The Platters" mark from FPI and PPI, and in 2009,

13   Marshak acquired all rights and titles that LiveGold possessed in the mark. Third,

14   Marshak argues that he has independently established ownership through his use of the

15   mark in commerce by promoting live performances of his Platters group in Las Vegas

16   and around the nation since 1996 or at least 2001.[14]

17                                    **i.     Tony Williams Transfer**

18         EnMan cannot assert ownership of "The Platters" through the 2003 Tony Williams

19   transfer.  In 1982, the New York County Supreme Court held that "a 1967 agreement . . .

20   nullified any claim" Williams might have against FPI.  *Marshak I*, 2001 WL 92225, at *7.

21   Marshak acknowledges this decision, but states that the injunction was later vacated.

22   (Dkt. no. 17 at ¶ 13.)  This is an incorrect assessment of the 1982 decision.  It is true that

23   the New York Supreme Court determined that, in light of Robi's victory against FPI in

24   1984,[15] enforcement of FPI's claim of ownership in the trademark was inappropriate.

25   _____

26   [14] Marshak licensed the rights to "The Platters" from FPI in 1996; he began promoting
     his Las Vegas show in 2001.  (Dkt. no. 17 at ¶¶ 37, 34.)

27   [15] This decision affirmed a 1974 action involving Robi and FPI which held that the
28   transfer of rights in "The Platters" mark from the original members to FPI was fraudulent.

*FPI v. Williams* 1296, 1297 (N.Y. Sup. 1987).  But the court declined to vacate its 1982 order.  *Id.*  The court held that Williams had a "full and fair opportunity to raise the key issues involved on his present application [in 1982], and he had the right to appeal the challenged determination and neglected to do so."  *Id.*  And in 1988, in a Ninth Circuit decision regarding another case between FPI and Williams over ownership of "The Platters," the court determined that the 1982 New York Supreme Court judgment had preclusive effect; Williams could not assert ownership in "The Platters."[16]

Further, guidance from a 1997 District of Nevada action between Robi and Reed, *Robi v. Reed*, No. 95-1029, is instructive here.  The court held that as between Robi and Reed, Reed had the superior right in the mark.  *Id.*  First, the court determined that because the 1974 California decision voided the 1956 assignment of rights to FPI, the right to use "The Platters" mark in commerce remained with the group.  *Marshak I*, 2001 WL 92225, at *13 (discussing *Robi v. Reed*, No. CV-S-95-1029) (citations omitted)).  Second, to determine whether Robi or Reed had superior rights to the name "The Platters," the court reasoned that:

> the group (as opposed to FPI) owned and had the exclusive right to use the name prior to [Robi's] departure and continued to own and have the exclusive right to the name subsequent to his departure. Since Reed was the original member who remained with The Platters as the others left, it is Reed who [was deemed to own] the exclusive right to the mark The Platters.

*Marshak I*, 2001 WL 92225, at *13 (discussing *Robi v. Reed*, No. CV-S-95-1029) (citations omitted).  The Ninth Circuit affirmed.  *Robi v. Reed*, 173 F.3d at 736.

///

---

[16] The 2001 New York decision also recounted the litigation concerning Williams' right to "The Platters" mark and reached the same conclusion as this Order.  *See Marshak I*, 2001 WL 92225, at *8-12.  That decision, which was later altered by the Ninth Circuit determination in *FPI v. Powell*, did state that Williams' heirs' rights to use "The Platters" mark were superior to Reed's*, Marshak I*, 2001 WL 92225, at *20, but in a footnote, the New York court noted that any rights the Williams plaintiffs had to "The Platters" were derivative of FPI's rights. *Id.* at fn. 8. Therefore, this holding is in accord with the previous cases holding that Williams cannot assert independent common law ownership over "The Platters" mark.

1    Similarly, because Reed stayed with the group longer than Williams, his rights in

2    the mark are superior to Williams' rights.  Any ownership stake Williams transferred to

3    Marshak, if he had the right in the mark at all, is inferior to Reed's.

4                              **ii.      FPI Transfer**

5    EnMan also cannot assert ownership in the mark through transfer from FPI.  As

6    stated above, in 2001, the Ninth Circuit held that:

7        [U]nless the [FPI] can present evidence that they used the trademark in a
         way that was not false and misleading (e.g., by identifying the group as
8        "The Platters Since 1970" or some similarly distinguishing label), they
         cannot assert a common law trademark in "The Platters."
9

10   *FPI v. Monroe Powell*, 7 F. App'x at 795-96.  Although the 2002 New York decision held

11   that this was not sufficient to trigger the 1987 escape clause, *Marshak II*, 229 F. Supp.

12   2d at 185, it did not determine what rights FPI had in "The Platters."  Rather, the New

13   York court merely held that the 2001 Ninth Circuit decision left open "the possibility,

14   however remote, that FPI can establish a common law trademark right to the name 'The

15   Platters.'"  *Id.* Defendants present no evidence demonstrating that FPI or PPI had

16   acquired any rights by 2006.

17                          **iii.      Independent Ownership**

18   Finally, Marshak asserts that he has independent rights in the trademark dating

19   back to 1996 or at least 2001 in "The Platters." (Dkt. no. 17 at ¶¶ 37, 34.)

20   Marshak presented a similar argument in a trademark dispute concerning his use

21   of another famous 1950s musical group's mark, "The Marvelettes."  *Schaffner*, 2012 U.S.

22   Dist. LEXIS 66536, at *15-16.  There, Marshak acknowledged that defendant Motown

23   owned the right to "The Marvelettes" mark "in connection with the sale of recorded

24   performances," but argued that Motown "abandoned its use of the mark in connection

25   with live musical performances" because the group no longer performed.  *Id.*  at *16.

26   Since Marshak promoted a group performing as "The Marvelettes," he argued that he

27   was the senior user and owner of the mark in connection with live performances.  *Id.* at

28   *16.  The court rejected this argument, holding that "a stranger to the creation of goodwill

17

1   associated with a mark" could not "develop common law rights in the mark for live

2   performances where the original owner maintains rights in the mark to market musical

3   recordings." *Id.* at 19. The court stated that "a name or mark is merely a symbol of

4   goodwill; it has no independent significance apart from the goodwill it symbolizes." *Id.* at

5   *16 (citing *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) (brackets omitted)).

6   Therefore, "use of the mark . . . in connection with a different goodwill and different

7   product would result in a fraud on the purchasing public who reasonably assume that the

8   mark signifies the same thing, whether used by one person or another." *Id.* (brackets

9   omitted; ellipses in original).

10      The principles underlying trademark law do not support Defendants' attempted

11   transmogrification. Marshak cannot create independent goodwill in a new Platters band

12   simply by finding five vocalists, calling them The Platters, and having them sing Platters

13   hits on stage. Marshak's infringing use of a famous and beloved band name cannot

14   acquire its own goodwill that supersedes and replaces the goodwill of the original band.

15      Therefore, between Defendants and Reed (and their respective corporations),

16   Reed is the senior user and HRE owns the mark. Reed began using the mark in 1953,

17   long before Marshak. He never abandoned the mark because he either performed as a

18   member of The Platters and/or received royalties from The Platters sound recordings

19   since 1953. (Dkt. no. 41 at ¶ 3.) Importantly, nothing in the 1987 stipulation contradicts

20   this conclusion. Rather, the 1987 stipulation held that Reed could not perform under

21   "The Platters" mark until a final judgment with all appeals exhausted held conclusively

22   that FPI did not own the mark. (Dkt. no. 16-1.) The stipulation foresaw the possibility

23   that Reed might attempt to reclaim ownership of "The Platters" mark down the line, and

24   he did so in the 2011 Nevada action.

25                  **2.    Confusingly Similar**

26      The Ninth Circuit uses a non-exhaustive eight factor test for determining likelihood

27   of consumer confusion: (1) strength of the mark; (2) proximity or relatedness of the

28   goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing

channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 & fn. 11 (9th Cir.1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir.2003). "Some *Sleekcraft* factors are much more important than others, and the relative importance of each individual factor will be case specific." *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (quotation marks and citation omitted). "In essence, the test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Id.* (citations and brackets omitted).

Plaintiff claims that there is a likelihood of confusion because: (1) consumers will confuse Marshak's group with the original Platters; and (2) consumers will confuse Marshak's group with HRE's performing group, which goes by "Herb Reed and the Platters" or "Herb Reed's Platters." (Dkt. no. 3 at 13.) For reasons stated below, the Court agrees with Plaintiff on both counts.

### a.   Confusion between the Parties' Use of "The Platters" Mark

### i.    Factor 1:  Strength of the Mark

"The Platters" is an inherently distinct, arbitrary mark because it uses common words that have no relevance to the musical performances and recordings to which the words are applied. *See In re MBNA Am. Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003) (noting that arbitrary marks are inherently distinctive). Further, the 2012 Nevada action held that "The Platters" is a strong mark because "The Platters was inducted into the Rock & Roll Hall of Fame in 1990, the Vocal Group Hall of Fame in 1998, and the Grammy Hall of Fame in 1999 and 2002. Therefore, The Platters remains a famous musical group today and the first factor, strength of the mark, weighs in favor of finding a likelihood of success." *Monroe Powell's Platters*, 2012 WL 288705, at *6.

1

2

      **ii.**  **Factors 2 and 3: Proximity or Relatedness of the Goods and Similarity of the Marks**

3     Factors two and three, the relatedness of goods and similarity of the marks both

4 weigh in Plaintiff's favor.  The marks are identical.  Further, EnMan advertises its group

5 as "The Platters," the group sings original Platters hits, and EnMan does not promote its

6 group as a tribute band.  (*See* dkt. no. 3-12 at 1.)  Because of this, consumers are likely

7 to believe the two goods are related, or that EnMan's "The Platters" is actually the

8 original, authentic version.  *See Sleekcraft*, 599 F.2d at 350 (goods are related when

9 there is a likelihood that the consumer will "assume there is an association between the

10 producers of the related goods, though no such association exists.").

11

      **iii.**  **Factor 4: Evidence of Actual Confusion**

12     The parties do not present evidence of actual confusion.  However, "[b]ecause

13 of the difficulty in garnering such evidence, the failure to prove instances of actual

14 confusion is not dispositive."  *Sleekcraft*, 599 F.2d at 353.  This factor therefore favors

15 neither party.

16

      **iv.**  **Factor 5: Marketing Channels Used**

17     Factor five slightly favors Defendants.  Reed and his company no longer

18 organize performances under "The Platters" mark, but rather perform as "Herb Reed and

19 The Platters" or "Herb Reed's Platters."  HRE uses "The Platters" mark in connection

20 with sales of vintage sound and video recordings of the band.

21     The type of marketing channels used for sales of sound recordings and

22 videotapes of old live performances are different than the channels used for sales of live

23 performances.  *However*, HRE was enjoined from calling its group "The Platters" until

24 2011.  The company may now use "The Platters" mark in connection with its live musical

25 performances.  Were it to do so, the marketing channels used by the two parties would

26 be largely the same.  So factor five only slightly favors Defendants and were HRE to

27 begin promoting its group as The Platters, this factor would favor Plaintiff.

28 *///*

1
2

        **v.**      **Factor 6: the Type of Good and Degree of Care Likely to be Exercised by the Consumer**

3        Although Plaintiff does not present evidence regarding the degree of care likely

4 to be exercised by the purchaser of music show tickets, factor six favors HRE.  "In

5 assessing the likelihood of confusion to the public, the standard used by the courts is the

6 typical buyer exercising ordinary caution."  *Sleekcraft*, 599 F.2d at 353. "[V]irtually no

7 amount of consumer care can prevent confusion where two entities have the same

8 name."  *Exctropix v. Liberty Livewire Corp.*, 178 F.Supp.2d 1125, 1134 (C.D.Cal.2001).

9 "It is irrational to expect that even the most sophisticated consumer will exercise the kind

10 of scrupulous examination that would enable him or her to discern the difference

11 between nearly identical marks." *Id.*

12        A typical buyer in this case is a patron at a live performance of either party's

13 group.  As mentioned, EnMan bills its group as The Platters and its group performs in

14 the musical style of the original band.  Because of this, a reasonable consumer would

15 not know whether he was purchasing tickets to EnMan's group or HRE's group when

16 buying tickets to a Platters show.

17
18

        **vi.**    **Factor 7: Defendants' Intent in Selecting the Mark**

19        "This factor favors the plaintiff where the alleged infringer adopted his mark with

20 knowledge, actual or constructive, that it was another's trademark." *Brookfield*

21 *Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (citing

22 *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir.1993)).

23        It is not clear that when Marshak acquired the mark from FPI he knew that it did

24 not own the mark.  Marshak originally licensed the right to use The Platters mark from

25 FPI in 1996, at which time FPI was still battling ownership over the mark.  Though many

26 courts had held that FPI did not own "The Platters" mark, the litigation was still ongoing,

27 ///

28 ///

and there had been certain decisions in FPI's favor.[17] And due to the prior inconsistent judgments and the 2001 New York decision in FPI and Marshak's favor, Marshak may have believed the transfer of ownership rights from FPI to LiveGold and LiveGold to EnMan was legitimate. Thus, due to the inconsistent prior judgments and ongoing litigation, without further evidence it is not obvious that EnMan knew "The Platters" mark was not rightfully owned by FPI when it purchased the mark from the corporation.[18]

### vii.   Factor 8: Likelihood of Expansion

When the goods or services of the parties are related, this factor is irrelevant. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004).

In sum, factors 1-3 and 6 strongly favor HRE. Factor 5 slightly favors Defendants. Factors 4, 7, and 8 favor neither party. The marks are identical. HRE uses its mark to promote and sell its band's hits. Defendants use the mark to promote and sell tickets to live performances of a band that dresses like the original Platters, sings the Platters' hits, and advertises itself as The Platters. For these reasons, it is likely that consumers will confuse EnMan's Platters group for HRE's.

### b.   Confusion between the Marshak's Use of "The Platters" and "Herb Reed's Platters"

For many of the same reasons described above, there is a likelihood of confusion between Marshak's use of "The Platters" and "Herb Reed's Platters." The Court discusses only those factors for which the analysis on this point differs from above analysis.

---

[17] For example, the 1986 Ninth Circuit decision involving FPI and Williams and the 1987 settlement between Reed and FPI.

[18] As mentioned in the section discussing ownership (*supra*), Marshak should have known that the other two means in which Defendants claim Marshak acquired the mark – from Marshak's independent use in commerce and from Tony Williams' estate – were not legitimate. However, it is possible that because of the muddy and mercurial holdings regarding ownership of the mark, Marshak simply attempted to acquire ownership from any person or entity claiming ownership in the mark in an effort to acquire the rightful title.

1   Factor one favors HRE.  Though "The Platters" mark is inherently arbitrary, "Herb
2   Reed's Platters" is a descriptive mark – describing Reed's modern version of his famous
3   group, The Platters.  At oral argument, Plaintiff stated that when Reed performed with
4   the group, HRE's group was billed as "Herb Reed and the Platters."  The group is billed
5   as "Herb Reed's Platters" at all other times.  Because of Reed's recent passing, the
6   Court refers to HRE's performing group as "Herb Reed's Platters."  Notably, "Herb Reed
7   and the Platters" and "Herb Reed's Platters" are used interchangeably by HRE in its
8   brief. "Herb Reed and the Platters" is a registered trademark and has achieved
9   incontestable status.  (Dkt. no. 3-10 at 3-4.)  "Herb Reed's Platters" is not registered.
10  But because the marks are used interchangeably by HRE, the Court treats the two
11  names identically for the purposes of this Order. Thus, because incontestability serves
12  as conclusive proof that the mark has secondary meaning, factor one favors Reed.  *See*
13  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 fn. 3 (9th Cir. 2002).

14  Factor three also favors HRE.  Though the marks are not identical, both groups
15  purport to be the modern iteration of the original Platters.  As mentioned, EnMan does
16  not inform consumers that its band is a tribute band.  Because both groups advertise
17  themselves as the authentic Platters group, the marks are similar. *See also Monroe*
18  *Powell's Platters*, 2012 WL 288705, at *6 (holding that factor three favored HRE where
19  defendant copycat band's website did not distinguish between Powell's group and the
20  original Platters).

21  Factor 5 favors HRE.  The marketing channels for EnMan's Platters group and
22  Herb Reed and the Platters are nearly identical.   Both promote national live
23  performances of a group claiming to be the current version of the 1960's Platters.

24  For these reasons, there is a likelihood of consumer confusion between
25  Marshak's "The Platters" mark and "Herb Reed's Platters."

26  **B.    Likelihood of Irreparable Harm**

27  "Previously, the rule for preliminary injunctions in the trademark context was that
28  courts presumed irreparable injury if the moving party showed likelihood of success on

the merits." *BoomerangIt, Inc. v. ID Armor, Inc.*, No. 5:12-CV-0920, 2012 WL 2368466, at *3 (N.D. Cal. June 21, 2012) (citing *Brookfield Commc'ns., Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir.1999)).   "Recent precedent, however, has cast doubt on that presumption. Specifically, *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 393(2006) and *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 1000 (9th Cir.2011) rejected similar presumptions in the patent and copyright contexts." *Id.*  "In light of these cases and the Supreme Court's restatement of the standard for issuing a preliminary injunction in [*Winter*, 555 U.S. at 20], the viability of the presumption of irreparable harm in the trademark context is in question."  *Id.*

As the *BoomerangIt* court explained:

> The Ninth Circuit has not yet addressed whether irreparable harm can be presumed upon a showing of likelihood of success on a trademark infringement claim. . . . District courts in this Circuit that have addressed this issue have found that the governing law has changed, and a plaintiff is not granted the presumption of irreparable harm upon a showing of likelihood of success on the merits.

2012 WL 2368466, at *3-4 (citing, among other cases, *Seed Services, Inc. v. Winsor Grain, Inc.*, No. 1:10-CV-2185, 2012 WL 1232320, at *4 (E.D.Cal. Apr.12, 2012) ("[T]he court will not assume the existence of irreparable injury due to a showing of success on the merits."); *AFL Telecommunications LLC v. SurplusEQ.com, Inc.*, No. CV 11–01086, 2011 WL 4102214, at *3 (D.Ariz. Sept.14, 2011) ("Irreparable harm is no longer presumed in a trademark or copyright case upon a showing of a likelihood of success on the merits.") (other citations omitted)). The Court therefore does not give HRE a presumption of irreparable harm in this case.

To prevail on this Motion, HRE must also establish that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury."  *eBay*, 547 U.S. at 391. That is, Plaintiff must establish that the harm done to HRE by Marshak's infringing use cannot be remedied except through injunctive relief.  *See MGM Studios, Inc. v. Grokster, Ltd.*,518 F. Supp. 2d 1197, 1210 (C.D.Cal. 2007).

24

1   HRE claims that without injunctive relief, Reed's legacy will suffer irreparable

2   reputational harm as an entertainer and he and his heirs and assigns will be denied "the

3   right to benefit from the fame [Reed] brought to" "The Platters" mark.  (Dkt. no. 3 at 15.)

4   Defendants characterize HRE's argument as "near laughable."  (Dkt. no. 16 at

5   23.) They claim that immediate relief is not warranted because EnMan's group has been

6   performing for over a decade, so any additional harm the group causes to Reed's

7   reputation experienced through the pendency of this litigation will be negligible and is

8   certainly not irreparable.  EnMan cites language in the 2001 New York action to support

9   this argument.  There, the court held that:

> where competing groups of Platters have appeared for many years, there
> can be no claim of injury to the public interest by allowing FPI to continue
> what it has been doing since 1969 in presenting groups as "The Platters"
> that do not include any members of the original Platters.[19]

13   Yet trademark infringement is no laughing matter.  Reed could not assert his

14   rights in "The Platters" mark until recently – until the 1987 escape clause was triggered.

15   Once he did, other courts enjoined copycat groups from further infringement.[20]  This

16   Court follows their lead.  While unauthorized Platters groups have illegitimately

17   performed under the mark for decades, and no doubt Marshak's group is not the last

18   remaining copycat, this Court cannot condone trademark infringement simply because it

19   has been occurring for a long time and may continue to occur.  Doing so would not only

20   sanction trademark infringement, but could encourage wide-scale infringement on the

21   part of persons hoping to tread on the goodwill and fame of vintage music groups.

---

[19] At oral argument Defendants argued that this statement rings even more true now in light of Reed's recent death, because HRE's group can no longer claim superior authenticity to copycat groups based on the fact that its membership consists of an original member of The Platters.  Though Plaintiff may no longer argue that its version is more authentic than others because Reed is a member, Reed assigned his rights to "The Platters" to his company before his death.  With it, he transferred the goodwill associated with the mark.  This goodwill survives Reed's death.

[20] As mentioned, the 2012 Nevada action enjoined the imitation group organized by Monroe Powell's Platters, LLC.

1    Moreover, although EnMan's use may have already done much damage to

2    Reed's legacy, the Court finds more merit to Plaintiff's claims than Defendants do.   In

3    fact, the *Monroe Powell's Platters* court, dealing with a substantially similar claim, found

4    that the harm to Reed's reputation caused by a different unauthorized Platters group

5    warranted a preliminary injunction. 2012 WL 288705, at *7.   As mentioned earlier,

6    Powell, like Marshak, organized an unauthorized Platters group that performed using the

7    same performance style and same songs as the original Platters.   *Id.* The court noted

8    that:

9        [c]ontinued use of the mark in a confusingly similar manner will likely
         damage Reed's reputation as a performer. Reed's reputation and rights to
10       the mark will remain valuable to Reed after he stops performing. For
         example, Reed could license the mark to Powell for a fee. Moreover, Reed
11       likely will lose goodwill among consumers if The Platters name continues to
         be diluted. . . . Further, if the Court permits continued confusion over
12       Reed's rights to the mark, additional groups similar to Powell's group could
         form and further harm Reed's reputation and goodwill.
13

14   *Monroe Powell's Platters*, 2012 WL 288705, at *7.

15   **C.    Balance of Hardships and Public Interest**

16   "In each case, a court must balance the competing claims of injury and must

17   consider the effect on each party of the granting or withholding of the requested relief."

18   *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987); *see also*

19   *International Jensen v. MetroSound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In

20   evaluating the balance of hardships a court must consider the impact granting or

21   denying a motion for a preliminary injunction will have on the respective enterprises").   In

22   addition, courts "must consider the public interest as a factor in balancing the hardships

23   when the public interest may be affected." *Caribbean Marine Services Co. v. Baldrige*,

24   844 F.2d 668, 674 (9th Cir. 1988).

25   The balance of the hardships favors HRE. The goodwill associated with the

26   original "The Platters" mark will continue to be diluted if EnMan is allowed to promote its

27   imitation group in Las Vegas and around the nation.  The harm may not be as significant

28   as it once was, in prior decades when Reed was alive and there were not numerous

26

1    iterations of phony Platters groups.  But it is still a significant harm.  As this Court and

2    other courts have found, "The Platters" mark is a strong mark imbued with a significant

3    amount of goodwill due to the band's fame and the continuing popularity and ubiquity of

4    many Platters hits.  Unauthorized use by copycat groups dilutes the goodwill surrounding

5    the original Platters band.

6        The harm to Defendants is less significant. EnMan may still organize and promote

7    its unauthorized version of The Platters; it must simply signify that its band is a tribute

8    band.  In his Declaration, Marshak claims that, even so, he would lose much of his

9    business were the Court to grant this Motion because he has contracts with vendors and

10   advertisers to promote his group as The Platters.  (Dkt. no. 17 at 5-6.) Marshak asserts

11   that if the Court grants this Motion, EnMan would be forced to close its Las Vegas show

12   and cease its business, and that the business could not be revived at a later date.  (*Id.* at

13   21-22.)  However, in EnMan's Response Brief, it claims that "consumers and Marshak's

14   business partners have come to associate THE PLATTERS mark with Marshak."  (Dkt.

15   no. 16 at 24.)  If this is the case, then designating EnMan's group as "Larry Marshak's

16   Tribute to the Platters" or "Larry Marshak's Salute to the Platters" is unlikely to harm

17   Defendants because "The Platters" trademark is already associated with Marshak's

18   name.  Rather than harm Defendants, this injunction will only better inform consumers

19   about when they are purchasing a performance of Defendants' version of The Platters.

20   Any harm EnMan encounters because consumers will now realize that its version is a

21   tribute band and not the authentic Platters group is not cognizable here.  This is only the

22   harm Defendants will experience from no longer being permitted to infringe on HRE's

23   trademark.   Because this use was not proper in the first place, it cannot harm

24   Defendants to enjoin them from doing what they were never authorized to do.  In fact,

25   Defendants assumed the risk that they might be enjoined from infringing on the mark.

26       Finally, because trademark law seeks to prevent consumer confusion in the

27   marketplace, *see* 15 U.S.C. § 1125(a)(1), a preliminary injunction in this case serves the

28   public interest.  Enjoining EnMan from using "The Platters" except when designated as a

1    tribute band will lend some clarity to the market for Platters performances.  EnMan's

2    group will no longer be one of the multiple imitation Platters groups cluttering the

3    marketplace for old and new fans seeking tickets to a performance of a current version

4    of the original band.

5    **VI.   BOND**

6          It would be an understatement to say that the parties disagree as to the bond

7    amount.  EnMan requests a bond of $1.4 million for every year during which this case is

8    ongoing.  HRE argues that if the Court is to require a bond, the bond  should be no more

9    than $10,000, which was the bond required in the 2012 Nevada action.

10          The court has "wide discretion in setting the amount of the bond, and the bond

11   amount may be zero if there is no evidence the party will suffer damages from the

12   injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878,

13   882 (9th Cir. 2003).  In setting bond, the court must consider evidence of the "potential

14   financial ramifications of entering a preliminary injunction." *Walczak v. EPL Prolong, Inc.*,

15   198 F.3d 725, 733 (9th Cir. 1999). In *Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp.

16   2d 1070, 1079-80 (N.D. Cal. 1998), a computer software copyright infringement action,

17   the court considered four factors in determining the bond amount:  (1) profits which the

18   defendants would have earned on sales during the period of the injunction; (2) out-of-

19   pocket expenses related to promotion of the defendant's infringing product; (3) damage

20   to the infringing company's reputation; and (4) expenses associated with the recall of the

21   infringing product, which in this case is equivalent to expenses associated with EnMan's

22   changing its advertisements to denote that its group is a tribute band.

23          Defendants do not produce evidence for which the Court can analyze the

24   *Cybermedia* factors.  The only evidence they provide are the lost profits figures which

25   EnMan calculates on the basis of its 2012 quarterly revenues from the Las Vegas show,

26   amounting to $619,182.23, and revenues from national bookings for its Platters group,

27   amounting to $191,451.76. (Dkt. no. 17 at ¶¶ 19, 23.)  These figures are insufficient for

28   two reasons.  First, many of EnMan's shows, including its lucrative Las Vegas show,

present its Platters group singing alongside other vintage music groups.  It is therefore impossible, without more evidence, to establish how much of the above-referenced revenues are linked to consumers purchasing tickets to see EnMan's Platters group as opposed to the other vintage performing groups.  Second, although Marshak states in his declaration that EnMan would incur significant costs and lose a great deal of business were it enjoined from promoting its group as "The Platters," Defendants make no effort to quantify that loss.  Both parties agree that EnMan may continue to promote its group as "Larry Marshak's Tribute/Salute to the Platters."  For both of these reasons, it is clear that EnMan will continue to receive revenues from performances involving its Platters tribute band.  Defendants argue that there would be expenses associated with changing the promotion materials to any of the alternative names proposed by HRE, but did not offer evidence to demonstrate the specific costs involved.  Accordingly, the specific lost revenues associated with this preliminary injunction are unclear.

In light of the absence of evidence of injury to Defendants resulting from the issuance of the injunction, the Court finds that a bond in the amount of $10,000.00 is sufficient security. This was the amount provided to defendants in the substantially similar 2012 Nevada action.  *Monroe Powell's Platters*, 2012 WL 288705, at *8.

## VII.   ORDER AND PRELIMINARY INJUNCTION

IT IS THEREFORE ORDERED that Plaintiff Herb Reed Enterprises, LLC's Motion for Preliminary Injunction (dkt. no. 2) is GRANTED to the following extent:

Defendants and their agents are preliminary enjoined from use of the mark "The Platters," and any equivalent or phonetically similar names or marks, in connection with any vocal group in any advertisements, promotional marketing, or other materials, with two narrow exceptions.

First, Defendants may use the mark "The Platters" in connection with the names "Larry Marshak's Tribute to The Platters" or "Larry Marshak's Salute to The Platters." The words "tribute" or "salute" must be at least one half the font size of the words "The Platters" in any of Defendants' advertising.

29

1    Second, Defendants may use the mark "The Platters" in any other manner with

2  Plaintiff's permission.

3    IT IS FURTHER ORDERED that Plaintiff shall secure this Preliminary Injunction

4  by posting a bond in the amount of $10,000 with the Clerk of the Court within five (5)

5  calendar days from the filing of this Order.

6    ENTERED THIS 24th day of July 2012.

7  _____

8  UNITED STATES DISTRICT JUDGE